Filed 12/23/14  In re Yvette L. CA2/2

## NOT TO BE PUBLISHED IN THE OFFICIAL REPORTS

California Rules of Court, rule 8.1115(a), prohibits courts and parties from citing or relying on opinions not certified for publication or ordered published, except as specified by rule 8.1115(b).  This opinion has not been certified for publication or ordered published for purposes of rule 8.1115.

IN THE COURT OF APPEAL OF THE STATE OF CALIFORNIA

SECOND APPELLATE DISTRICT

DIVISION TWO

| | |
|---|---|
| In re YVETTE L. et al., Persons Coming Under the Juvenile Court Law. | B254339 (Los Angeles County Super. Ct. No. CK91450) |
| LOS ANGELES COUNTY DEPARTMENT OF CHILDREN AND FAMILY SERVICES, Plaintiff and Respondent, v. MANUEL L., Defendant and Appellant. | |

APPEAL from a judgment of the Superior Court of Los Angeles County. Carlos E. Vasquez, Judge.  Affirmed.

Mitchell Keiter, under appointment by the Court of Appeal, for Defendant and Appellant.

Mark J. Saladino, County Counsel, Dawyn R. Harrison, Assistant County Counsel, Stephen D. Watson, Deputy County Counsel, for Plaintiff and Respondent.

_____

Manual L. challenges juvenile court orders denying his petition for a modification and terminating his parental rights. (Welf. & Inst. Code, §§ 388, 366.26.)[1] Appellant shirked his duty to parent his two young dependent children. Just as the court was about to terminate parental rights, appellant requested reunification services. Appellant's belated appearance did not convince the juvenile court that it would be in the children's best interest to restart the dependency process while appellant began services, particularly because he demonstrated no ability to take custody. Continuing appellant's "weekend visitor" status is less beneficial than a permanent, stable home. We affirm.

## FACTS

This appeal involves siblings Yvette L. (born in 2008) and Daniel L. (born in 2010), who were detained by the Department of Children and Family Services (DCFS) in January 2012. One year earlier, DCFS investigated a report that the children's mother Cindy T. (Mother) is an addict who sold drugs from her home. When Mother gave birth to a stillborn in July 2011, she and the fetus tested positive for methamphetamine. DCFS instituted a voluntary case in August 2011, after Mother agreed to undergo drug rehabilitation. The children were placed with Baudelia T., their maternal grandmother (MGM). Voluntary efforts failed: Mother did not participate in drug testing or a substance abuse program.

Mother reported that the children's father, appellant Manuel L. (Father), kicked her in the stomach. The MGM saw Father hit Mother, and accused Father of using drugs with Mother, of breaking her windows, flattening her tires and destroying her property. Father is a known gang member, who, at the time the children were detained, was sought for questioning by police in connection with a murder.

DCFS filed a petition on January 17, 2012, alleging that Mother cannot care for her children due to her drug abuse and failure to participate in remedial services; further, Mother did not provide her five-year-old daughter Ailyn with medical care for the girl's

---

[1]    All statutory references in this opinion are to the Welfare and Institutions Code.

2

seizures and speech delays, placing the children at risk of harm.[2] Father's whereabouts were unknown. The court found a prima facie case for detaining the children, leaving them with the MGM.

In the jurisdiction report, the MGM stated that "'Daniel does not even know his mother . . . he thinks that I am his mother because I was really the one that took care of them.'" Mother did not visit the children, and the children do not ask about her. The MGM does not want the children in foster care with strangers and is willing to care for them until adulthood. They are healthy and comfortable in the MGM's home. Neither Mother nor Father was available for comment on the allegations: they did not contact DCFS or inquire about visitation.

The MGM indicated that Father "has not been seen for approximately 1 year." DCFS conducted a due diligence search for Father through 22 sources, without success. At the jurisdiction hearing on March 2, 2012, the court found insufficient evidence of a proper search for Father. It proceeded with the case as to Mother, sustained the allegations against her, and asserted jurisdiction over the children.

DCFS conducted a further search for Father. On May 25, 2012, the court found that the search was adequate, and that there is a substantial danger if the children were placed in Father's care. It denied Father reunification services as a presumed father unless he presented himself to DCFS within six months.

In August 2012, DCFS reported that the children refer to the MGM as "mom." The MGM opined that Mother is still not sober. Though verbal, Yvette did not ask for her parents. The MGM met the children's needs and wanted to provide them with a permanent home. Father never contacted DCFS to arrange visitation.

Mother did not comply with the case plan by attending drug treatment programs, and did not arrange for monitored visits. The court terminated Mother's reunification

---

[2]     Mother and Ailyn are not parties to this appeal. Father is not related to Ailyn.

services on August 24, 2012, and set a hearing to select a permanent plan. In September 2012, the court identified the goal as adoption.

DCFS submitted a report for the selection and implementation hearing. The report notes that the court never provided reunification services to Father, and Mother's services were terminated. The MGM wants to adopt the children: she has known them since birth, they have resided with her since mid-2011, and she is meeting all of their needs. The children are healthy and happy in the MGM's home and want to stay with her. Father had no visits with them. Mother has not complied with the case plan by attending a drug treatment program. DCFS recommended termination of parental rights and implementation of a plan of adoption.

The court continued the December 2012 permanent plan hearing because Father was not given notice. The social worker sent new notices to Father, who called DCFS on December 27, 2012, then filed a statement of parentage. Mother and Father made their first appearances in the case at a hearing on January 3, 2013. The court continued the hearing so that DCFS could complete an adoptive home study.

In a June 2013 status report, DCFS stated that the children are well-adjusted in the home of the MGM, whom they refer to as their mother. Ailyn receives needed medications and is now able to interact appropriately with her siblings. The family is well-bonded. The MGM meets the children's needs and is committed to providing permanency to them through adoption.

Father filed a request for a modification on June 17, 2013. He asked the court to give him custody of the children as he is a nonoffending parent under the petition. He argued that he was not given proper notice of the jurisdiction hearing. Alternatively, he asked the court for six months of reunification services. Father stated that he sees the children every weekend and they are "extremely bonded" to him. He declared that he lived with the children from the time of their birth until Daniel was one month old, and has provided for them and cared for them in a paternal manner by feeding them, reading to them, and helping them with their education. The paternal uncle declared that the MGM was aware of the children's contacts with Father, and knew that she could lose

4

custody if DCFS found out that Father was having unmonitored visits. The court set Father's petition for hearing.

In a supplemental report, DCFS stated that Father perpetrated domestic violence against Mother and, according to the MGM, has not been a part of the children's lives for several years. The children regularly stay with their paternal uncle, and the MGM acknowledged that the children may have seen Father at those times, when she was not there. The children confirmed that they see Father, but they could not recall any recent or specific dates. The paternal uncle reported that Father visits the children. Father stated that he sees the children at his brother's house. He did not contact the MGM because they do not get along. Father admitted that he formerly used marijuana, but said that he stopped using the drug in recent months. Father also admitted that he and Mother engaged in multiple physical altercations during their relationship. DCFS opposed reunification services for Father and recommended adoption by the MGM. Father began having monitored visits with the children every other weekend.

Counsel for the children opposed Father's petition for a modification. The minors contended that DCFS made multiple efforts to locate Father, but he chose to remain hidden. Because Father was aware of the dependency petition, and the children's placement with the MGM, his challenge to their placement at the selection and implementation hearing is insignificant. There is no changed circumstance that would benefit the children, who consider the MGM to be their mother and love living with her. Father has shown no plans to care for his children permanently, and it would harm them to be separated from their half sister Ailyn.

On January 22, 2014, the court found that Father's modification request is not in the best interest of the children, even if there was a change of circumstances. The court cited "a strong interest in the permanency of these children [who] have lived with the maternal grandmother ever since they can remember." Father requested a hearing to contest the proposed termination of his parental rights.

At the contested permanent plan hearing, Father testified that the children began living with the MGM several years ago. Since then, he has visited them every weekend,

and the children refer to him as "Dad" or "Papi." He takes them to restaurants, plays with them, and disciplines them verbally when necessary. The children are the love of his life, and there has never been a period of time when he did not visit them. His visits are monitored by family members.

On cross-examination, Father explained that he did not seek custody when the children were detained by DCFS because "I just moved away" following his separation from Mother. He continued to see the children on weekends, when they would all stay at his brother's house. During those visits, Father would purchase food and clothing for the children, and feed and bathe them. Since January 2014, Father has had day-long visits with the children at the MGM's home.

In closing argument, DCFS observed that Father never requested reunification services until the eve of the permanent plan hearing, after the court identified adoption as the proposed plan. Father did not assert paternity for a year, and did not state that he is prepared to take custody. He simply did not want his parental rights terminated; however, the issue before the court is permanency for the children. Daniel has not lived with Father since he was one month old: he does not recognize Father as a daily caregiver but rather as someone who visits on weekends. Minors' counsel requested that parental rights be terminated because Father's visits were monitored and inconsistent, and he does not occupy a parental role. The children look to the MGM for daily nurturing since two years, and this permanent relationship should not be disrupted. Father asked the court to implement a legal guardianship to protect his parental rights. He does not want to disrupt the children's permanent home with the MGM.

The court examined the evidence to determine whether the relationship between Father and the children promotes the children's well-being to such a degree as to outweigh the benefit of a permanent home. Father's visits were pleasant: he played with the children, took them to a pizza parlor, and occasionally gives them money; however, the court was not convinced that this amounts to a parent/child relationship. There is no testimony that Father provides regular financial support, or has undertaken parental duties on a regular basis. The children have lived with the MGM for an extended period—in

6

Daniel's case, for most of his life. The court found that there is insufficient evidence to disturb the policy favoring adoption.

The court found that the children are adoptable, and it would be detrimental to return them to the parents. It terminated Mother's and Father's parental rights and transferred the children's care to DCFS for adoptive planning and placement. The MGM was designated as the prospective adoptive parent. Father appeals from the orders denying his petition for a modification and terminating his parental rights.

## DISCUSSION

### 1. Father Did Not Request Custody When the Children Were Removed

The juvenile court had jurisdiction over the children beginning in March 2012, when it sustained two counts of child neglect and endangerment due to Mother's drug abuse. "[A] jurisdictional finding good against one parent is good against both. More accurately, the minor is a dependent if the actions of *either parent* bring her within one of the statutory definitions of a dependent." (*In re Alysha S.* (1996) 51 Cal.App.4th 393, 397, italics added.) Prior to DCFS intervention, the children were in Mother's custody: Father stopped being a custodial parent when Daniel was one month old.

When the court orders removal of a child from a custodial parent, it determines whether the noncustodial parent desires custody. "If that parent requests custody, the court shall place the child with the parent unless it finds that placement with that parent would be detrimental to the safety, protection, or physical or emotional well-being of the child." (§ 361.2, subd. (a).) Father did not request custody when the children were removed from Mother. DCFS was unable to locate Father; as a result, Father did not receive reunification services. (§ 361.5, subd. (b)(1).)

The statute authorizing placement with a nonoffending, noncustodial parent was not triggered here, because Father did not request custody when the children were removed from Mother. Father did not appear until the eve of the permanent plan hearing, knowing full well that his children were with the MGM the entire time. Father argued to the juvenile court that he "made an appropriate plan by allowing them to reside with their maternal grandmother and their half sibling." Father did not make a plan for the children.

7

On the contrary, he said that he did not contact the MGM because they do not get along. Instead, DCFS made a plan with the MGM to provide child care and the court approved that plan, absent any expression by Father of a desire or ability to take custody.

Although Father argues on appeal that the juvenile court erred by denying him custody under section 361.2, this is misleading. Father did not make any showing that he is able to care full time for two small children: he did not say what his living situation is, or whether it is suitable for children. He visited the children first at his brother's house, and now at the MGM's house, on weekends. Father acknowledged that he does not wish to disrupt the children's home with the MGM. At most, he seeks to continue in his role as a weekend visitor, without the day-to-day responsibilities that the MGM has provided since 2011.

Section 361.2 does not require that custody "be immediately awarded to a noncustodial parent regardless of when in the dependency process the parent comes forward. Rather, its language suggests that the statute is applicable only at the time the child is first removed from the custodial parent or guardian's home." (*In re Zacharia D.* (1993) 6 Cal.4th 435, 453.) Even if the statute applies at a later stage of the proceedings, it "assumes the existence of a competent parent able to immediately assume custody." (*Id.* at p. 454.) Father did not show an ability to immediately assume custody. Nothing in the statutory framework suggests that the Legislature wished to elevate a presumptive parent's belated interest in custody over a child's interest in stability and permanency at the tail end of the dependency process. (*Ibid.*) Father cannot rely on cases in which fathers promptly came forward within six months of disposition, when he did not do so himself. (See *In re Jonathan P.* (2014) 226 Cal.App.4th 1240, 1253-1254; *In re Suhey G.* (2013) 221 Cal.App.4th 732, 743.)

Father suggests that he would have gotten involved earlier, if only he had received notice of the proceedings from DCFS. Father has been secretly visiting the children: it is reasonable to infer that he did not want the government to know where he was, no doubt because the police were looking for him, as well as DCFS. Father's family participated in this charade. The children's paternal uncle was the prime mover in keeping Father's

whereabouts hidden, as he was the person who collected the children from the MGM and took them to see Father. The paternal uncle frankly declared that he knew the MGM would get in trouble if the DCFS social worker found out about Father's unmonitored visits with the children. Given the family's complicated efforts to keep DCFS from learning of Father's contacts with the children, knowing that Father was forbidden from having unauthorized visits, Father's complaint that he was not given proper notice of the proceedings rings hollow.

The decisive issue is that Father knew since the inception of these proceedings that Mother no longer parented their children. Yet Father did not declare paternity until his parental rights were about to be terminated. A father "must promptly attempt to assume his parental responsibilities . . . [and] demonstrate 'a willingness himself to assume custody of the child—not merely to block adoption by others.'" (*Adoption of Kelsey S.* (1992) 1 Cal.4th 816, 849.) Parents who "refuse to meet their parental obligations face the profound loss of a relationship with their child." (*In re Nolan W.* (2009) 45 Cal.4th 1217, 1238.)

## 2. **Finding of Detriment to the Children**

Father contends that the juvenile court never found that his custody would be detrimental to the children, which must precede termination of parental rights to avoid severing a positive, nurturing parent-child relationship. (*Cynthia D. v. Superior Court* (1993) 5 Cal.4th 242, 253, 256; *In re T.G.* (2013) 215 Cal.App.4th 1, 20.) The dependency law no longer uses the term "parental unfitness" and instead requires a finding that awarding custody of a dependent child to a parent would be detrimental. (*In re P.A.* (2007) 155 Cal.App.4th 1197, 1211.) Here, the court found by clear and convincing evidence that a substantial danger exists to the physical and emotional health of the children and there is no reasonable means to protect them without removal from Father's custody, during a hearing on May 25, 2012.

The court's finding is supported by the record. The DCFS reports indicate that Father kicked Mother in the stomach; the MGM witnessed Father's domestic violence. The MGM also accused Father of damaging her property and using drugs. Father does

not deny the accusations. Indeed, Father admits to drug use and to multiple incidents of domestic violence. Further, the police were actively searching for Father in connection with a murder when the children were detained. Contrary to Father's claim, the court's finding was not based purely on Father's absence but rather on the uncontested reports of Father's violence. (§ 358, subd. (b) [the court may consider DCFS reports when making a dispositional finding].)

The cases that Father cites are inapposite. In *In re Gladys L.* (2006) 141 Cal.App.4th 845, a noncustodial father submitted to dependency jurisdiction, then disappeared for three years. No claim was made of domestic violence. Upon the father's reappearance at the permanent plan hearing, the juvenile court denied him visits and terminated his parental rights. This was error because the record did not show that giving custody to the father would be detrimental. (*Id.* at p. 848, fn. 3.) By comparison, the record here shows that Father has a history of drug use and domestic violence—and admits to it—which supports the lower court's finding of detriment. Even less on point is *In re Z.K.* (2011) 201 Cal.App.4th 51, 55, in which a father absconded from the state with an infant and the hapless mother spent five years searching for her child, only to have her parental rights terminated just as she finally received news of the child's whereabouts. Father has not been searching for his lost children during the course of this case: he elected to have the MGM parent the children instead of stepping up to take custody himself. He was content to be a weekend visitor who sees the children when it is convenient for him to do so.

**3.** **Denial of Father's Petition for a Modification**

When reunification services are bypassed or terminated, this "ordinarily constitutes a sufficient basis for terminating parental rights." (*In re K.C.* (2011) 52 Cal.4th 231, 236-237.) A parent may revive the reunification issue only by demonstrating changed circumstances. (§ 388; *In re Nolan W.*, *supra*, 45 Cal.4th at p. 1235; *Kimberly H. v. Superior Court* (2000) 83 Cal.App.4th 67, 72; *In re Casey D.* (1999) 70 Cal.App.4th 38, 47.) There must be a genuine change in circumstances such that the child's best interests will be promoted by the proposed change in order. (*In re*

10

*Anthony W.* (2001) 87 Cal.App.4th 246, 250; *In re Ramone R.* (2005) 132 Cal.App.4th 1339, 1348.) To make this determination, the court may consider the entire factual and procedural history of the case. (*In re Jackson W.* (2010) 184 Cal.App.4th 247, 258; *In re Justice P.* (2004) 123 Cal.App.4th 181, 189.) The ruling cannot be reversed unless there is a clear abuse of discretion—an arbitrary, capricious or patently absurd determination that exceeds the bounds of reason. (*In re Stephanie M.* (1994) 7 Cal.4th 295, 318-319; *In re A.S.* (2009) 180 Cal.App.4th 351, 358.)

a. *Changed Circumstances*

Father's asserted "changed circumstance" is that his whereabouts changed from unknown to known when he finally called DCFS on December 27, 2012, a year after the children were detained, although they began living with the MGM in mid-2011, when Mother was offered voluntary drug rehabilitation services. It is difficult to see this as a genuine change in circumstances. Father knew that the MGM was the full-time caregiver, but never troubled to assert his parental rights, content to linger on the sidelines and have secret meetings with the children, engineered by his brother. Not until this highly convenient situation appeared to be ending did Father make his move in dependency court.

Apart from shirking his parental duty to provide a home for the children after they were detained from Mother, Father did not state that he is currently able to provide the children with a stable, safe, permanent home. On the contrary, he wants the children to stay with the MGM, and he can visit. In other words, no change from before. Without a showing of parental ability to provide a safe home for children, an eleventh-hour attempt to extend the dependency proceeding is unavailing. (*In re A.S.*, *supra*, 180 Cal.App.4th at p. 358.) In addition, Father did not show that he resolved his admitted issues with drugs and domestic violence by enrolling in anger management, parenting, or domestic violence classes, so the court could not safely release the children to Father even if he had a home for them. The problems raised at disposition hearing persisted, unchanged.

11

*b.* <u>*Best Interests of the Children*</u>

In determining a child's best interest, the court considers (1) the seriousness of the reason for dependency jurisdiction; (2) the strength of the bonds between the child, the parent and the caretakers; and (3) whether the problems leading to dependency may be easily removed or ameliorated. (*In re Kimberly F.* (1997) 56 Cal.App.4th 519, 530-532.) Here, the initial reason for detaining the children was Mother's drug abuse; however, the children also had to be detained because Father was nowhere to be found and certainly not active enough in his children's lives to make himself immediately known to DCFS and demand sole custody and termination of dependency jurisdiction as a nonoffending, noncustodial parent. Even after Father presented himself to DCFS in December 2012, he waited six more months to request custody or reunification services.

With respect to the second factor, the strength of the bonds between the children, Father, and the MGM, the totality of the circumstances does not favor Father. Daniel has lived with the MGM effectively since birth. She is the only parent—meaning a full-time caregiver—that Daniel has ever known, and he considers her to be his mother. Yvette has lived with the MGM since age three, and considers the MGM to be her mother. There is no evidence that either of the children ask about Father. Although Father claims to have visited them every weekend throughout the dependency proceedings, he apparently did not make an impression on his children, as they could not recall any recent visits. There is no evidence that Father ever took the children to medical appointments or regularly provided their food, clothing and hygienic needs. The children loved living as a family unit with the MGM and their half sister Ailyn.

There is no evidence that Father could provide his children with the kind of permanent, stable home that the MGM has provided, and he never took the initiative to tackle his domestic violence issues. Father did not demonstrate an ability to take custody. There is no evidence that the children showed separation anxiety when visits with Father were over, which tends to discount the strength of their bond. By contrast, the children are strongly bonded to the MGM, who has cared for them full time for most of their lives.

12

We cannot say that the juvenile court exceeded the bounds of reason when it cited the children's strong interest in permanency with the MGM and their half sister as a basis for denying Father's petition for a modification. On the eve of the permanent placement hearing, after two years in foster care, the children's interest in permanency and stability outweighs Father's recent interest in reunification. (*In re Marilyn H.* (1993) 5 Cal.4th 295, 309; *In re Anthony W.*, *supra*, 87 Cal.App.4th at pp. 251-252.) The court properly denied Father's petition for a modification.

4. **Termination of Parental Rights**

At the selection and implementation hearing, the court must select adoption as the permanent plan and terminate parental rights if it finds that the child is likely to be adopted. (§ 366.26, subd. (c)(1); *In re Celine R.* (2003) 31 Cal.4th 45, 49; *In re Jamie R.* (2001) 90 Cal.App.4th 766, 773.) Adoption is the plan preferred by the Legislature. (*In re Derek W.* (1999) 73 Cal.App.4th 823, 826; *In re Ronell A.* (1995) 44 Cal.App.4th 1352, 1368.)[3] A parent may avoid termination of parental rights by showing why a statutory exception applies, and that termination would be detrimental to the child. (*In re Celine R.*, *supra*, 31 Cal.4th at p. 53.) *In re Derek W.*, *supra*, 73 Cal.App.4th at p. 826; *In re Melvin A.* (2000) 82 Cal.App.4th 1243, 1252.)

Father argues that his parental rights should not be terminated. To avoid termination, he must show that he has "maintained regular visitation and contact" with the children and there is a "compelling reason" to believe that ending the parental relationship would be detrimental to the children. (§ 366.26, subd. (c)(1)(B).) He bears the burden of proving that the children would be "greatly" harmed by termination of parental rights, and that he holds a "parental" role with the child. (*In re Brittany C.* (1999) 76 Cal.App.4th 847, 853; *In re Angel B.* (2002) 97 Cal.App.4th 454, 466-468.)

Father must show both prongs of the exception: regular visitation and a benefit to the children if the relationship were continued that outweighs the well-being the children would gain by permanently staying with the MGM in the home they have always known.

---

[3]     Father does not dispute that the children are likely to be adopted.

As to the first prong, Father testified that his visits have been consistent throughout, even if they were not approved by DCFS or the court. Father's testimony was uncontroverted. As to the second prong, the dependency court determined that the children's relationship with Father is not so significant that they would be greatly harmed if it were severed. The court's determination is supported by substantial evidence. (*In re Autumn H.* (1994) 27 Cal.App.4th 567, 576.)

Daniel was eight months old and Yvette was three when DCFS learned of Mother's drug abuse in 2011. Mother had just given birth to a stillborn who tested positive for methamphetamine. The children went to live with the MGM while Mother was encouraged to participate in drug rehabilitation. There is no indication that Father was prepared to step up and take custody of his children. Instead, the reports show that Father was on the run from the police, who wanted to question him in connection with a murder, and he had engaged in domestic violence.

Father continued to lay low for the duration of the dependency proceedings. He claims to have visited the children regularly, yet never came forward to assert his parental rights. He let the MGM fulfill all parental roles for the three children in her care, one of whom has medical problems. His only excuse for neglecting his parental obligations is that "I just moved away" when he separated from Mother.

Father maintains that the juvenile court erred by not allowing him to call five-year-old Yvette as a witness. After a visit with Father in November 2013, Yvette came home and told the MGM that she did not want to have to choose between the MGM and Father, after the paternal aunt told Yvette that she had to choose who she wants to be with. The MGM indicated that she would tell Father that his family's discussion of case matters with the children was emotionally damaging. Father argues that he should have been able to ask Yvette directly, on the witness stand, about her ambivalence.

The court is not required to have a dependent child testify at a hearing, but is required to consider the child's wishes and to act in the child's best interests. The child may ask to be present or the court may order it. (§§ 349, 366.26, subd. (h)(1)-(2).) "[I]t is within the juvenile court's discretion to exclude the testimony of a child in order to

14

avoid psychological harm to the child, even though that testimony is relevant, the child is competent to testify, and the child is both practically and legally 'available' to testify." (*In re Jennifer J.* (1992) 8 Cal.App.4th 1080, 1088.)  In *Jennifer J.*, a seven-year-old expressed "ambivalence" respecting termination of parental ties, so her parents sought direct evidence of her desire to continue parental contacts.  (*Id.* at pp. 1083-1084.)  The child's attorney objected that a seven-year-old should not be asked to make distinctions between adoption and ongoing parental contact and could be traumatized by the questions.  (*Id.* at p. 1086, fn. 4.)  The minor's testimony was not crucial to resolving a disputed issue, because the evidence already showed that she was bonded to her parents. In any event, the court could decide "that adoption was the best disposition of Jennifer's future *notwithstanding* Jennifer's expressed views to the contrary and the court's full knowledge of those views."  (*Id.* at p. 1087.)  Thus, if the child's feelings can be presented without live testimony and the issues would not be materially affected by the child's testimony, the court may decide not to require it.

Here, Yvette's statement was not "spontaneous" as Father claims.  Rather, the paternal aunt caused the child to feel threatened.  This provoked Yvette to express her concerns to the MGM.  There is nothing ambivalent about the children's happiness with the MGM, or their desire to stay with her.  No one claims that the children ever demanded to live with or spend more time with Father, or Mother, for that matter.  Father proposed to have Yvette describe their relationship and explain whether she understands adoption and opposes it.  Yvette, through counsel, strongly opposed having a five-year-old explain the difference between adoption and guardianship and her testimony would be that she did not want to be the one who picked between Father and the MGM.  At this point in the proceedings, subjecting the child to examination at trial would not be productive, when she is willing to concede that the court had to decide what future was in her best interest.  It is not fair to ask young children "to choose whether they ever see their natural parent again or to give voice to approving that termination."  (*In re Leo M.* (1993) 19 Cal.App.4th 1583, 1593; *In re Amanda D.* (1997) 55 Cal.App.4th 813, 820.)

15

Father complains that the court prevented him from describing specific incidents in which he disciplined the children. Father was allowed to testify about his method of discipline. He said, "I just talk to them. I just tell them, don't do that, and they listen to me." The court sustained an objection that specific incidents of misbehavior were irrelevant. This was not an abuse of discretion: long narratives describing specific incidents of childish behavior were not necessary for the court to understand that Father plays a role in the children's upbringing.

Father visited the children regularly, but even frequent and loving contact between parent and child is not sufficient to establish the requisite benefit to the child if Father does not occupy a parental role and will not take custody. (*In re Teneka W.* (1995) 37 Cal.App.4th 721, 728; *In re Beatrice M.* (1994) 29 Cal.App.4th 1411, 1418-1419; *In re Andrea R.* (1999) 75 Cal.App.4th 1093, 1108-1109.) A "pleasant" relationship is not enough to establish a benefit to the child because "it bears no resemblance to the sort of consistent, daily nurturing that marks a parental relationship." (*In re Derek W.*, *supra*, 73 Cal.App.4th at p. 827.) "Interaction between natural parent and child will always confer some incidental benefit to the child." (*In re Autumn H.*, *supra*, 27 Cal.App.4th at p. 575.)

Apart from the incidental benefit of parent-child interaction, we must consider "the many variables which affect a parent/child bond. The age of the child, the portion of the child's life spent in the parent's custody, the 'positive' or 'negative' effect of interaction between parent and child, and the child's particular needs are some of the variables which logically affect a parent/child bond." (*In re Autumn H.*, *supra*, 27 Cal.App.4th at p. 576.) Daniel lived with Father for the first month of his life: he only knows Father from visits. Yvette was three when Father ceded his parenting duties to the MGM. While Father may love the children, he does not occupy a parental role, such that they look to him for their needs. It is difficult for a parent who has essentially never had custody to show that his relationship outweighs the benefit of a permanent adoptive home. (*In re Casey D.*, *supra*, 70 Cal.App.4th at p. 51.)

Father does not dispute that the children are thriving with the MGM, or that the MGM will adopt them. He does not even want them to be moved from the MGM's

16

home. He simply wants a guardianship to be in place. This is not part of the legislative plan mandating a preference for adoption. "Once the court determines adoption is feasible, the less desirable and less permanent alternatives of guardianship and long-term foster care need not be pursued. " (*In re Jose V.* (1996) 50 Cal.App.4th 1792, 1799; *In re Josue G.* (2003) 106 Cal.App.4th 725, 732.) Although Father insists that he did nothing wrong that would warrant the termination of his parental rights, the fact remains that he was not, is not, and does not plan to be the children's daily caregiver. He has left this job to the MGM, and wants it to stay that way. Father's opposition to adoption, on principle alone, is not sufficient to overcome the legislative preference in favor of adoption.

Father did not carry his burden of showing that the children would be greatly harmed by the termination of his parental rights, or that the benefits of continuing their relationship outweigh the benefits of a stable, permanent home. The juvenile court could reasonably find that Father's relationship is not sufficiently beneficial. In a guardianship or continued foster care, the children would have an unstable placement. Where, as here, children are likely to be adopted, the court must choose "the most permanent and secure alternative that can be afforded." (*In re Beatrice M.*, *supra*, 29 Cal.App.4th at p. 1419.)

## DISPOSITION

The judgment is affirmed.

NOT TO BE PUBLISHED IN THE OFFICIAL REPORTS.


BOREN, P.J.

We concur:


CHAVEZ, J.


HOFFSTADT, J.

17